IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| PAUL MAGUIRE, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 120163D |
| | ) | |
| v. | ) | |
| | ) | |
| LINCOLN COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the 2011-12 real market value of property identified as Account R162246 (subject property). A trial was held in the Oregon Tax Courtroom, Salem, Oregon, on July 16, 2012. Dennis L. Bartoldus, Attorney at Law, appeared on behalf of Plaintiff. Plaintiff and Patricia Patrick-Joling (Patrick-Joling), broker, testified on behalf of Plaintiff. Kristin H. Yuille, Lincoln County Assistant County Counsel, appeared on behalf of Defendant. Peter A. Boris (Boris), Chief Appraiser, Lincoln County, testified on behalf of Defendant.

Plaintiff's Exhibits 1 through 14 and Defendant's Exhibits A through C were admitted without objection.

## I. STATEMENT OF FACTS

Plaintiff, a real estate investor and retired chiropractor, testified that he purchased the two acre parcel in 2005 and contracted for a 363 unit mini-storage facility that was completed in 2006. He testified the mini-storage facility offers "a single story storage unit with roll-up door, cameras in the hallways, sheet metal roof and heated floors" with "gated" daily access and an on-site manager who lives above the "office." Plaintiff testified that "land and construction costs"

///

///

totaled "under $3 Million" for the 45,670[1] square foot mini-storage facility. Plaintiff testified

that the subject property "was built for an income stream" but the "decline" in number of units

rented is a result of the economy and the "easy access to the internet" allows individuals to "sell"

rather than "store" their possessions.

Plaintiff testified that he determined the subject property's 2011-12 real market value was

based on four sales of properties that he identified as comparable to the subject property. (Ptf's

Ex 3.) He testified that those four properties were located in Oregon: Medford, Shady Cove,

Beaverton and Bend. (*Id*. at 1.) Defendant challenged the comparability of the four properties to

the subject property, citing location, age (1976 for Bend property), size (Shady Cove property

has less than 60 units) and the Bend property was a "short sale" and the Medford property was a

"distressed sale." (*Id*. at 9.) The four properties ranged in size from 21,767 square feet to 40,877

square feet. (*Id*. at 1.) The price per square foot ranged from $16.39 to $45.26 with sale dates of

January 2010, December 2010, April 2011 and July 2011. (*Id*.) Plaintiff testified that he

determined a 2011-12 real market value of $1,571,504 (45,670 square feet times $34.41), "which

seems to be the most recently built [2004], most comparable [36,760 square feet], with a value

not polluted by RV income or laundry income." (Ptf's Ex 3 at 2.) Boris testified that those

properties identified by Plaintiff in its Exhibit 3 "are not comparable to the subject property"

because those properties are not located in Lincoln County and one sale is a foreclosure sale

whereas in Lincoln County there are "not as many foreclosure sales."

The parties debated the subject property's visibility from Highway 101 and Plaintiff's

advertising efforts. Plaintiff testified that he advertised on the "local radio station", offering the

---

[1] Defendant's Exhibit C states that the "total subject square footage, including residence, garage and office is 53,179." (Def's Ex C at 14.) The two appraisals prepared by C. Spencer Powell state that the total square footage of available storage units is 45,670 and gross building area is 55,431 square feet. (Ptf's Ex 1 at 15; Ex 2 at 1.)

"third month free with two months" payment, and he advertised that if an individual rented space in his facility the renter could request a truck to load and transport goods to the mini-storage unit. Plaintiff testified that he owns a "1/11th interest" in an adjoining tax lot but cannot "put up a sign" because the other owners cannot agree. He testified that the Oregon Department of Transportation "does not allow his signs" on Highway 101 and the "trees and vegetation" block view of the subject property.

Patrick-Joling testified she was contacted by Plaintiff who stated that he wanted to sell the property. She testified that her "opinion of selling price" as of "late 2011 and early 2012" was between $1.5 and $1.7 Million." Patrick-Joling testified that she relies on "trends" in determining a selling price, discussing Lincoln County single family housing sales; "foreclosure resales and short sales;" "asking prices for industrial sales" in Spanaway, Washington, and Eugene and Medford, Oregon, and "Active, Sold and New Listings; and Inventory for Lincoln County MLLS on 7/3/2012." (Ptf's Exs 4, 5, 10-14.) She reviewed the sale of a 226 mini-storage facility known as the Lighthouse Storage facility built in 1997 with "Highway 101 Frontage" and "subject to minor partition of two parcels" that sold on April 29, 2011 for $1,150,000. (Ptf's Ex 6.) Patrick-Joling testified that there is a "huge difference being visible from Highway 101," remarking that "location, location" is always important. She testified that the subject property is located close to the "Oregon State Trooper Shop" and on the road where people "dispose of trash." Boris disputed her conclusion that the subject property's location is detrimental to its real market value, stating few individuals select a "mini-storage facility by driving by it." Boris agreed with Patrick-Joling that "[t]he 2011 sale (Sale 9) of the Lighthouse Storage Facility in Lincoln City at $42 per square foot is a good indication for the sale of a 14 year old facility in a larger market, similar to the Newport market." (Def's Ex C at 20.)

Patrick-Joling testified about the sale of the Siletz Mini Storage, opened in 2002 with subsequent additions in 2003, 2006 and 2008 for a total of 108 storage units, "8 covered RV storage units and 32 outside rv/vehicle storage spaces." (Ptf's Ex 7.) She testified that this property sold after being listed for "23 days" on April 29, 2011, for $707,500. (*Id*.) Boris concluded that this property at "the $36 per square foot price represents the lower limit of the price range for the two 2011 sales" because "[t]his facility had the highest vacancy rate in the survey Mr. Powell had done for the 2011 Oregon Coast Bank's appraisal at 25% and sold to a local experienced operator for a reasonable value." (Def's Ex C at 20.)

Patrick-Joling testified that "loopnet" is a "clearing house for commercial property multiple listings." She testified that she reviewed the loopnet listings for two properties, both located in Washington state. (Ptf's Ex 8.) The Woodland, Washington property was described by Patrick-Joling who referenced the listing as a "self storage facility containing 8 single-story self storage buildings and a 2-story building housing the rental office and apartment for a total of 304 storage unties with 69 climate-controlled units and 4 open vehicle storage spaces, originally built in 1996." (*Id*.) This "bank-owned distress sale" closed in November 2011, selling at "$25.08" per square foot. (*Id*. at 1-2.) Patrick-Joling testified that she did not contact the broker of the Kalama, Washington property that sold on May 31, 2011, for $44.83 per square foot. (Ptf's Ex 9.) She testified that the property is "conveniently located off of Interstate 5" with "750 feet of Interstate 5 Freeway Frontage" and was "built in phases," beginning 2007 and is currently "29,000 square feet," including "994 SF managers office/house." (*Id*. at 1-2.)

Boris testified that he has over 20 years of appraisal experience and Plaintiff offered no objection to Boris being deemed an expert witness. Boris testified that he "had a complete tour" of the subject property "when it was built." He testified that the subject property is an

"intriguing property" because the "outside walls are the building itself," describing it as "Fort Apache" with one opening. He concluded that the design maximizes the available land, permitting "so many units within the two acres."

Boris testified that after considering the "four tests," specifically "legally permissible," "physically possible," "financially feasible" and which use "results in highest value," he concluded that "the highest and best use of the property, as improved, is its current use as a public storage facility." (Def's Ex C at 11, 13.) In response to Plaintiff's questions, Boris acknowledged typographical errors, stating that the subject property is "zoned for high-density multi-residential" when in fact it is zoned for "light industrial." (*Id*. at 11.) He also acknowledged that even though he stated that the appraisal purpose was "to estimate the statutory Real Market Value of the land, buildings, structures, and personal property identified as of the assessment date, January 1, 2001, (*sic*) for the 2001-02 (*sic*) assessment year," the real market value of Plaintiff's personal property was $3,000 and was exempt because it is below "the taxable threshold." (*Id*. at 10, 89.)

Boris testified that he considered the "three approaches to value: cost, income and sales comparison." (*Id*. at 13.) Using the cost approach, Boris testified that he used the "Marshall's [& Swift's] Cost Estimator" computer program, concluding "the value of each square foot at $40.11" and a total real market value for the "53,179" square foot facility to be "$2,133,010." (*Id*. at 14.) He testified that if "you want to retain anything of value in this climate," noting "annual rainfall totals of 65 to 75 inches," "you must take care in storing it because of "salt/rust problems." (*Id*. at 6.) With respect to the subject property, Boris testified that he found "[n]o major maintenance issues" and the "overall physical condition of the structure is good to very good for its age of only 5 years as of the date under consideration." (*Id*. at 14.) Boris testified

that to the facility value he added permits and system development fees for a total facility real market value of $2,141,988 and he noted that the value "compare[d] favorably with the amount shown on the Lincoln County Assessor's 2011-12 Board of Property Tax Appeals adjudicated roll value for the entire improvement of $2,122,840." (*Id*. at 15.) To the facility or improvement real market value, Boris added Plaintiff's June 20, 2005, land purchase price of $480,577, concluding that "there have been few arms-length sales of industrial zoned bare lots in the Lincoln County area for several years, essentially since the real estate market subsided." (*Id*. at 16, 17.)

Boris testified that he reviewed 11 sales of mini-storage facilities located in Lincoln County that occurred over ten years. (*Id*. at 45.) He testified that he identified four comparable properties, then "a comparative analysis" was "performed." (*Id*. at 21.) Boris testified that next "[t]he three most relevant sales" were "compared for their elements of value to determine a price range for the subject." (*Id*. at 24.) Two of the three properties were the same as Plaintiff's Exhibits 6 and 7. Boris concluded that "$45 per square foot was selected, slightly above the low points of this bracket [$66 and $36 per square foot]." (*Id*. at 26.)

Boris testified that he considered the income approach. In his appraisal report, Boris wrote:

> "I will not be employing the income approach since I believe data from the specific market involved in the study is the most revealing aspect of the income approach. I have not been able to obtain this data since the local businesses consider this a competitive area and are reluctant to pass along their operating statistics whose ability to remain confidential is problematic. Bringing in data from a market with different demand different weather conditions and different maintenance requirements will not provide an answer for a facility within this specific market."

(*Id*. at 27.)

/ / /

After considering the two approaches to value, cost and comparable sales, Boris testified he concluded that "[t]he cost and sales comparison approaches" should "be given equal weight," (*Id*. at 30.) Boris's "opinion * * * of the subject property land and improvements [real market value] as of January 1, 2011, is approximately: **$2,500,000**." (Id. at 31.) Boris requested that the court sustain the Board of Property Tax Appeals total real market value of $2,494,390.

Both parties submitted copies of two documents: "Real Estate Appraisal Update Report," prepared by C. Spencer Powell, MAI, stating "As Is Value: October 31, 2010," of $2,200,000 (stabilized) and "Real Estate Appraisal Summary Report," prepared by C. Spencer Powell, MAI, stating "As Is Value: September 16, 2011," of $2,030,000. (Ptf's Ex 1 at 43; Def's Ex A at 43; Ptf's Ex 2 at 1; and Def's Ex B at 1.) C. Spencer Powell did not testify and neither party discussed those reports although Boris referenced Powell's income approach and Boris was asked about the purpose of Powell's appraisal. (Def's Ex 2 at 33-34.)

## II. ANALYSIS

The issue before the court is the 2010-11 real market value of Plaintiff's property. Real market value is the standard used throughout the ad valorem statutes except for special assessments. *See Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620, at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev*., 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1),[2] which reads:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

/ / /

---

[2] References to the Oregon Revised Statutes (ORS) and the Oregon Administrative Rules (OAR) are to year 2009 unless otherwise stated.

There are three approaches of valuation (cost, income, and comparable sales) that must be considered in determining the real market value of a property even if one of the approaches is found to not be applicable. *Allen v. Dept. of Rev.*, 17 OTR 248, 252 (2003); ORS 308.205(2) and OAR 150-308.205-(A)(2). Even though the subject property is an income producing property, Plaintiff did not present that approach and Defendant concluded that "data from the specific market involved" was not available because the competition was reluctant to "pass along their operating statistics," lacking assurances of confidentiality. (Def's Ex C at 27.) Defendant considered the cost approach and gave it the same weight when reconciling the cost approach to the comparable sales approach.

A.    *Comparable sales approach*

In a case such as this one before the court, the comparables sales approach may be used to value improved properties. *Chambers Management Corp v. Lane County Assessor*, TC-MD No 060354D, WL 1068455 at *3 (April 3, 2007) (citing Appraisal Institute, *The Appraisal of Real Estate* 335 (12th ed 2001)). The legislature requires real market value to be determined in all cases by "methods and procedures in accordance with rules adopted by the Department of Revenue * * *." ORS 308.205(2). The Department of Revenue adopted OAR 150-308.205-(A)(2)(c), stating that, "[i]n utilizing the sales comparison approach[,] only actual market transactions of property comparable to the subject, or adjusted to be comparable, will be used. All transactions utilized in the sales comparison approach must be verified to ensure they reflect arms-length market transactions."

Plaintiff selected four properties that he identified as comparable to the subject property. None of those properties were located in Lincoln County. Plaintiff places the most weight on the Medford property built in 2004 that is identified in the listing as a "Bank OREO property"

distressed property. (Ptf's Ex 3 at 9.) In contrast, Boris selected three properties that were all located in Lincoln County as comparable to the subject property. None of those properties were bank-owned "distress" properties.

"This court has been reluctant to consider 'foreclosure' sales as 'arm's-length transactions' because such sales 'may well involve an element of compulsion on the part of the seller.' " *Voronaeff v. Crook County Assessor*, TC-MD No 110361C, WL 1426847 at *4 (Apr 25, 2012) (citations omitted). However, a foreclosure sale may be "a voluntary *bona fide* arm's-length transaction between a knowledgeable and willing buyer and a willing seller." *Ward v. Dept. of Revenue*, 293 Or 506, 508, 650 P2d 923 (1982). "There are narrow exceptions determined on a case-by-case basis to the holding that bank-owned property sales are not typically representative of real market value." *Brashnyk v. Lane County Assessor*, TC-MD No 110308, WL 6182028 *5 (Dec 12, 2011). "[W]here the majority of sales are distress, it would seem that that kind of sale would provide a more accurate reflection of the market." *Morrow Co. Grain Growers v. Dept. of Rev.*, 10 OTR 146, 148 (1985).

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet his burden of proof." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990).

Plaintiff offered no evidence he verified that the transactions were arm's length market transactions. Plaintiff's selection of bank-owned properties located outside Lincoln County when sales of non-bank-owned properties in the same county as the subject property occurred close to the assessment date is not persuasive evidence of the subject property's real market

value as of the assessment date. Plaintiff made no qualitative or quantitative adjustments to the sale price of the properties selected to make those properties comparable to the subject property. Plaintiff minimized the subject property's most significant feature -- each storage unit is heated; a feature that given the subject property's location in a wet climate is a distinguishing feature that a tenant would consider when renting a unit. Plaintiff offered no competent evidence such as an appraisal report to support his requested value. Two appraisal reports were submitted, but neither appraiser testified. Even though the court gives little weight to an appraisal report when the appraiser does not testify, those appraisal reports support a real market value for the subject property in excess of Plaintiff's requested value. Plaintiff computed a real market value excluding over 7,500 square feet available for the on-site manager residence, garage and office. Plaintiff's determination of the subject property's real market value was understated. Plaintiff failed to carry his burden of proof.

Even though the burden has not shifted under ORS 305.427, the court has jurisdiction to determine the "real market value or correct valuation on the basis of the evidence before the court, without regard to the values pleaded by the parties." ORS 305.412. Defendant submitted an appraisal report and determined a reconciled real market value for the subject property using both the cost and comparable sales approaches. Defendant concluded that the comparable sales approach supported the Board of Property Tax Appeals determination that the subject property's real market value is $2,494,390. Defendant's evidence supports its conclusion and the court accepts Defendant's conclusion.

/ / /

/ / /

/ / /

### III. CONCLUSION

After careful consideration of the testimony and evidence, Plaintiff failed to carry his burden of proof. The court concludes that Defendant's appraisal report and evidence support the subject property's real market tax roll value for the 2011-12 tax year. Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is denied.

Dated this ＿＿ day of August 2012.

 

 

JILL A. TANNER
PRESIDING MAGISTRATE


*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Presiding Magistrate Jill A. Tanner on August 30, 2012. The Court filed and entered this document on August 30, 2012.*